**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| **BRODERICK SMITH,** | ) |
| | ) |
| **Petitioner,** | ) |
| | ) |
| **v.** | )   **NO. 3:14-cv-01775** |
| | )   **JUDGE CRENSHAW** |
| **STATE OF TENNESSEE,** | ) |
| | ) |
| **Respondent.** | ) |

<u>**M E M O R A N D U M**</u>

**I.      Introduction**

Broderick Smith, an inmate of the USP-Lewisburg in Lewisburg, Pennsylvania, is serving a sentence of eighty-nine (89) years imprisonment imposed by the Davidson County Criminal Court in 2009 for two counts of carjacking, three counts of attempted robbery, one count of assault, one count of aggravated robbery, and one count of attempted carjacking.   This sentence was to be served consecutively to the Petitioner's 235-month sentence imposed by this Court for two convictions for armed bank robbery related to the state offenses.   Smith has filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his state conviction and sentence for carjacking, attempted robbery, assault, aggravated robbery, and attempted carjacking.   (Doc. No. 27).

Presently pending before the Court is the Respondent's answer to the habeas petition in which the Respondent asks the Court to dismiss the petition.   (Doc. No. 35).   The Petitioner has not responded.   However, the Petitioner recently filed a motion to ascertain status.   (Doc. No. 39).   Further, the Petitioner's appointed counsel has filed a motion to withdraw.   (Docket No. 36).

The petition is ripe for review, and this Court has jurisdiction. 28 U.S.C. § 2241(d). Having fully considered the record, the Court finds that an evidentiary hearing is not needed, and that the Petitioner is not entitled to relief on any of his claims. The petition therefore will be denied and this action dismissed.

## II.        Procedural History

In 2009, a Davidson County Criminal Court jury convicted Smith of two counts of carjacking, three counts of attempted robbery, one count of assault, one count of aggravated robbery, and one count of attempted carjacking. State v. Broderick Joseph Smith, No. M2009-01427-CCA-R3-CD, 2011 WL 322358, at *1 (Tenn. Crim. App. Jan. 14, 2011), aff'd after remand, 2011 WL 3568110, at *1 (Tenn. Crim. App. Aug. 15, 2011), perm. app. denied (Tenn. Dec. 14, 2011). He received a total effective sentence of 89 years, to be served consecutively to the Petitioner's 235-month sentence imposed by this Court for two convictions for armed bank robbery related to the state offenses. Id. His convictions arose out of a two-day crime spree in the Nashville area on June 24 and 25, 2007, that the petitioner committed because, according to his statement to police, he needed money to buy a handgun so he could kill his ex-girlfriend, her new boyfriend, and "who ever got in [his] way." Id.

On direct appeal, the Tennessee Court of Criminal Appeals affirmed the Petitioner's state convictions; however, the Tennessee Supreme Court remanded the case for reconsideration in light of an intervening appellate court decision. See State v. Broderick Joseph Smith, No. M2011-01173-CCA-RM-CD, 2011 WL 3568100, at *1 (Tenn. Crim. App. Aug. 15, 2011), perm. app. denied (Tenn. Dec. 14, 2011). After the remand, the judgments were again affirmed, and the Tennessee Supreme Court denied permission to appeal. Id.

Smith filed a timely pro se petition for state post-conviction relief. See Broderick Joseph Smith v. State, No. M2012-02705-CCA-R3-PC, 2013 WL 5701657, at *1 (Oct. 18, 2013), perm. app. denied (Tenn. Dec. 11, 2013). Afterwards, an amended post-conviction petition was filed on the petitioner's behalf by appointed counsel. Id. Following an evidentiary hearing, the post-conviction court denied the petition. Id. On appeal, the Tennessee Court of Criminal Appeals affirmed the decision of the trial court, and the Tennessee Supreme Court denied discretionary review. Id.

On August 28, 2014, the Petitioner filed the instant timely pro se petition for writ of habeas corpus. (Doc. No. 1). Following the appointment of counsel, the Petitioner filed an amended petition on July 6, 2015. (Doc. No. 27). This is the Petitioner's first federal petition attacking these convictions.

## III.    Summary of the Evidence

In its direct-appeal opinion affirming the trial court's judgment, the Tennessee Court of Criminal Appeals summarized the pertinent facts of the offense, conviction, and sentence as follows:[1]

> The Defendant, according to his statement to the police, needed money to buy a handgun because he was planning to kill his ex-girlfriend and her new boyfriend. The Defendant told the interviewing officers that "I knew in order for me to do it, I had to get some money, I had to get out of town [and] regroup, then I was going to come back." Once the Defendant returned to Nashville, he was going to go to the hospital where his exgirlfriend and her boyfriend worked and "kill them mother f----s" along with "who

---

[1]The factual findings of the state appellate court are presumed to be correct. 28 U.S.C. § 2254(e)(1).("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."). The petitioner here does not contest the appellate court's statement of facts.

ever got in my way. . . ." The Defendant, in order to get the money he needed, robbed a gas station and two banks on June 24 and 25, 2007. In addition to the robberies, the Defendant committed two carjackings, attempted a third carjacking, attempted to take the vehicles of three other people, and assaulted a man who tried to help one of the victims.

. . .

At trial, the State presented evidence that the Defendant began his crime spree at the Adcock Shell station in Madison, Tennessee. The store clerk, Hyeju Sung, testified that the Defendant entered the gas station at approximately 2:00 p.m. on June 24, 2007. The Defendant walked around the store until all of the other customers left and then came to the cash register to buy a beer. When Ms. Sung opened the cash register, the Defendant grabbed her by her neck, put a pair of scissors up to her neck, and demanded money. Ms. Sung testified that she gave the Defendant all the money in the cash register, approximately $400, and he then left the gas station. Ms. Sung identified the Defendant as the robber and testified that she knew the Defendant because he had been a regular customer at the gas station for approximately one year. In addition to Ms. Sung's testimony, the State also introduced surveillance video taken from the gas station showing the Defendant committing the robbery.

That same evening around 10:00 p.m., Kathleen Runder stopped with her two children at a Shell gas station near Vanderbilt University. Ms. Runder testified that she and her family are from Little Rock, Arkansas and that they were visiting Nashville that day to celebrate her mother-in-law's birthday. Ms. Runder was driving her mother-in-law's minivan when she and her children stopped at the Shell station to buy snacks and drinks. Ms. Runder's children had gotten back into the minivan and Ms. Runder was sitting in the driver's seat with the door open when the Defendant approached her with a knife. Ms. Runder's children were able to get out of the minivan and run into the gas station. The Defendant pressed the knife against Ms. Runder's thigh and demanded that she give him the keys to the minivan. Ms. Runder agreed, and as she got out of the car, the Defendant grabbed her purse, got into the minivan, and drove away. Ms. Runder picked the Defendant's picture out of a photographic line-up and was able to identify the Defendant at trial as the person who carjacked her.

The next day at approximately 2:00 p.m., the Defendant drove the minivan he had taken from Ms. Runder to 525 Donelson Pike, Nashville where he proceeded to rob the Fifth-Third Bank. Within 20 minutes of this robbery the Defendant then drove the minivan to 1712 West End Avenue and robbed the Wachovia Bank located there. The Defendant then parked and abandoned Ms. Runder's minivan in the Baptist Hospital parking garage. Around 2:30 p.m., Anna Lisa Barnett entered the Baptist Hospital parking garage. She had just come from a doctor's appointment where she had been given a cortisone shot to her knee when the Defendant walked past her. Ms. Barnett testified that she turned around and saw the Defendant coming back towards her and demanding her car keys. Ms. Barnett then "hobbled" towards her minivan, but when she got to the driver's side door, the Defendant had caught up to her and pulled out a knife. The Defendant again demanded her keys, and Ms. Barnett gave them to him. Ms. Barnett testified that the Defendant shouted "no, no, no" when he looked at Ms. Barnett's minivan and that it was nearly identical to the one he had taken from Ms. Runder. The Defendant tried to grab Ms. Barnett, and she began to crawl over the front of cars to get away from the Defendant.

The Defendant continued to chase Ms. Barnett until he saw Cecil Greene backing his truck into a parking space. Mr. Greene testified that after he had parked his truck, the driver's side door opened and the Defendant grabbed him by the left arm. The Defendant had his knife drawn back and demanded Mr. Greene's truck. Mr. Greene informed the Defendant he could not have the truck. Mr. Greene then asked his wife, who was seated in the passenger seat, to hand him his gun. The Defendant then ran back to Ms. Barnett's minivan and drove away. Mr. Greene testified at trial that he did not actually have a gun in his truck that day. Mr. Greene identified the Defendant as the man who attempted to carjack him. Ms. Barnett picked the Defendant's picture out of a photographic line-up, and identified him at trial as the person who stole her minivan.

The Defendant abandoned Ms. Barnett's minivan a few blocks away from the Baptist Hospital parking garage. The Defendant ran into an alley where he threw his pants, now covered in red dye from a dye pack in the money he had stolen from the banks, into a truck owned by James Reeves. Mr. Reeves testified at trial that he found pants in the back of his truck and when he moved them, he found a knife and a chain as well. After discarding his pants and his knife, the Defendant entered a FedEx delivery truck stopped

in front of 2010 23rd Avenue North. The driver, Uere Hobson, testified that she was in the back of the truck when she felt someone enter the truck. She turned around, and the Defendant demanded that she give him the keys to the truck. Ms. Hobson demanded that the defendant get out of the truck. The Defendant then began to push Ms. Hobson towards the back of the truck. The Defendant looked away for a moment, and Ms. Hobson was able to get past him and out of the truck. Ms. Hobson ran towards the Lentz Health Center parking lot because she knew there would be other people there. The Defendant chased Ms. Hobson, and she called 911 on her cell phone. Ms. Hobson proceeded to run through the Lentz parking lot yelling for help and warning others to lock their doors.

Once in the Lentz Health Center parking lot, the Defendant jumped into the passenger side of Jostin Lear's car and demanded the keys. Mr. Lear tried to push the Defendant out of the car and refused to give him his keys. The Defendant then grabbed for Mr. Lear's keys, but Mr. Lear was able to hold onto the ignition key. Mr. Lear got out of his car and began to walk around to the passenger side of the car. At about the same time Mr. Lear got out of his car, Dan Hedger, whose niece was parked next to Mr. Lear, came to assist Mr. Lear. The Defendant got out of Mr. Lear's car and punched Mr. Hedger in the face opening a cut over Mr. Hedger's eye. Mr. Hedger's niece, Bianca Tarantola, who was eight months pregnant at the time, had just secured her other child in a car seat when the Defendant got into the driver's seat of her car. Ms. Tarantola quickly unbuckled her child and ran with her car keys. The Defendant chased after her, slammed her into a wall, and pinned her against the wall as he grabbed for her car keys. The Defendant was eventually pulled off of Ms. Tarantola, and he began to walk away from the parking lot.

Officer Ronnie Brock of the Metro Nashville Police Department was at the health center undergoing his yearly physical when he was alerted by employees that something was going on outside. When Officer Brock stepped outside, he saw several people asking for help and pointing at the Defendant. Officer Brock described the Defendant as appearing bloody and sweaty. Officer Brock also testified that when he stepped outside of the center, the Defendant was walking away from the parking lot. Officer Brock approached the Defendant and detained him after several witnesses stated that the Defendant had tried to rob them. When Officer Brock arrested the Defendant, the Defendant was carrying a duffle bag containing a large amount of cash. The Defendant was taken to

General Hospital where he was read his Miranda rights, signed a rights waiver form, and gave a statement to the police. The Defendant presented no evidence and did not testify.

State v. Smith, No. M2009-01427-CCA-R3-CD, 2011 WL 322358, at **1-4 (Tenn. Crim. App. May 26, 2011).

In its opinion affirming the trial court's dismissal of the post-conviction petition, the Tennessee Court of Criminal Appeals recounted as follows the evidence presented at the post-conviction hearing:

> On April 12, 2012, the petitioner filed a pro se petition for post-conviction relief and, after the appointment of counsel, an amended petition was filed. The postconviction court conducted an evidentiary hearing, at which the petitioner testified that in June of 2007, he started "acting real irrationally" and went on a two-week drug and drinking binge after learning that his girlfriend was not being faithful to him. He was arrested twice after smoking crack cocaine in front of police officers. He explained that he was "just acting real irrationally and . . . drinking real real heavy" during that time period. The petitioner stated that he was about fifty years old in 2007 and had used drugs off and on since the age of seventeen or eighteen.

> The petitioner testified that he pled guilty to the federal charges before his case began in state court and that counsel started representing him in February 2009 when he was transported to Nashville from federal prison. He claimed that counsel told him at their first meeting that, because he had given a confession, "it was a waste of time and resources" for counsel to represent him and that it made "no sense" to challenge any of the evidence against him. He stated that "[they] started immediately having conflicts" after counsel said that to him, and he asked counsel to withdraw from the case. When counsel refused to withdraw, the petitioner called counsel's supervisor at the public defender's office, as well as wrote her letters, asking for a new attorney and complaining about counsel's representation. However, he was told that he could not be assigned another attorney and that he had "to make the best of it."

> The petitioner testified that, in 1982, when he was twenty-six years old, he underwent a mental evaluation at Vanderbilt

Psychiatric Outpatient Clinic because "[i]t was a stipulation of [his] parole from TDOC that [he] get mental health treatment." He was diagnosed with "a thinking disorder, a cognitive dysfunction" and was prescribed psychotropic medications. However, against medical advice, he dropped out of treatment and stopped taking his medication, and "progressively over the years [his] condition worsen[ed]." He said that at the time of the bank robberies, he was experiencing "some mental . . . anguish" and was "also under the influence of cocaine and alcohol too heavily[.]"

The petitioner testified that he told counsel "everything" about his mental health issues, drug use, and mental state at the time of the incident. He said that he asked counsel if he was going to challenge any of the evidence, but counsel told him there "ain't nothing that I can do for you" because he had signed a confession. The petitioner did not know whether counsel filed a motion to suppress his statement.

The petitioner testified that he was not given a mental evaluation until after the trial, when the attorney handling a matter in federal court suggested that he be evaluated and counsel "jumped on the band wagon." He recalled that federal counsel obtained funding from the federal court to have him evaluated by an "addiction specialist," Dr. Murray Smith, in relation to his federal matter. The petitioner said that federal counsel's representation overlapped with trial counsel's representation in state court, and he was certain that the two attorneys talked several times.

The petitioner testified that, at the time of the incident, his ex-girlfriend and her new boyfriend both worked at Vanderbilt Hospital, and he told counsel that his plan had been to go there and kill them and anybody else who got in his way. The petitioner believed that counsel's wife worked as a psychologist at Vanderbilt. The petitioner felt that counsel's continued representation was a conflict "because [the petitioner was] talking about going out there and killing these folks at the hospital and [counsel's] wife works there and she could have got caught up in all of that[.]" He told counsel that was another reason for him to withdraw from the case. When counsel said that he would not withdraw, the petitioner contacted the public defender and told her about the potential conflict, but she told him "that [was] not going to affect [counsel]'s representation of [him]."

The petitioner testified that he was brought back to Nashville a little more than a month before his mid-March trial. He recalled having discussions with counsel about the trial date. He told counsel that they could go to trial "whenever you say we are ready . . . since it seems like I can't get rid of you." The petitioner did not recall counsel's ever saying that there were other things he could do if he had more time, and he denied telling counsel that he wanted to have a trial rather than ask for more time to prepare. The petitioner did not think that counsel "put on much of a case for [him]," called any defense witnesses, or challenged any of the testimony or the confession.

On cross-examination, the petitioner did not remember filing a motion for speedy trial, explaining that it had been almost four years ago but that he would "take [the State's] word for it." He acknowledged that he had written numerous letters to the public defender and the district attorney about speeding up his transfer from federal custody under the Interstate Compact on Detainers. It was his understanding that, under the Compact, he had to be transferred to state custody and tried within 180 days after the request was filed. He said that he "wrote some letters trying to get back here, trying to expedite [his] transfer[,] . . . [n]ot requesting a speedy trial."

The petitioner acknowledged that the mental evaluation for his federal proceedings took place after his state trial and that, if a similar evaluation had taken place before his state trial, it would have taken time and required that he agree to being tried outside of the 180-day period. However, he could not remember whether he was willing to waive his 180-day period. The petitioner said that he thought counsel should have called his landlord to testify at trial because the landlord "kn[e]w the anguish that [he] was going . . . through and stuff[.]" He admitted committing the offenses but said, "[W]hen I signed the confession[,] I was out of my mind."

Trial counsel testified that he had worked in the public defender's officer at two different times for a total of twenty-four or twenty-five years. He became involved in the case on the day of the petitioner's arraignment. However, other attorneys in the office "had extensive contact" with the petitioner prior to that in assisting him with the Interstate Compact on Detainers process. He recalled that "[t]here was a somewhat inexplicable delay in getting him here." By counsel's calculations, when the petitioner arrived in the state, "he had to be tried within 180 days of his request . . . [i]n other words,

32 days later." He said that the petitioner "was very acutely aware" of the time frame in which his case had to be tried and was unwilling to waive the 180-day requirement because doing so would have eliminated "the potential motion to dismiss in the plausible event the State was unable to bring him to trial within those 32 days." The petitioner was also aware that waiving the 180-day requirement would give counsel additional time to prepare for trial and file potential motions, but the petitioner "absolutely did not want to waive the 180 days."

Counsel testified that he knew the petitioner was represented by federal counsel in his federal habeas corpus action, which concerned the attorney appointed to represent the petitioner on the federal bank robbery charges. Although the petitioner's federal, trial-level attorney was willing to provide information to counsel, the petitioner "absolutely prohibited [counsel] from getting with [federal trial counsel] about the case . . . or obtaining documents from him[.]" Counsel was particularly interested in obtaining the federal presentence report because he thought that it would contain information about the petitioner's social and treatment history. He "thought that would have been a critical document for trying to determine whether or not there were any such avenues to be explored." Counsel also had several informal conversations about the case with federal habeas counsel, but they did not "exchange any significant information" until after the trial. Both federal trial and habeas counsel offered to provide the document if the petitioner signed a release, but the petitioner would not do so. Counsel also contacted an Assistant United States Attorney, who told him that giving him a copy of the report would violate federal law. Counsel filed a motion in district court to have the document released, and "it was summarily dismissed without a hearing."

Counsel testified that the petitioner wanted him to file a motion to suppress the statement due to "his profound intoxication by use of drugs and his distraught emotional state." However, the petitioner told counsel that he was the only possible witness to those matters. Counsel also reviewed the statement and thought that the petitioner responded coherently to the detective's questions and "d[id]n't sound crazy." He did not think the statement had a "[]gross indicia of invalidity" and said they "would have need[ed] to have had a lot more information about [the petitioner]'s mental health" to have an effective motion to suppress. Counsel reiterated that it was a tactical decision to not file a motion to suppress "in the sense that [he] didn't feel that [they] had enough information to prevail on it[.]"

Counsel was aware of the petitioner's complaint that he should have withdrawn from the case because the petitioner had planned to kill people at Vanderbilt, where counsel's wife happened to work. However, counsel explained that the petitioner was in error because his wife did not work at Vanderbilt. He said that her practice was at Baptist Hospital and that, although some of the incidents happened in the parking garage there, she actually parked in a lot for physicians. He "did not feel morally conflicted" by his representation of the petitioner and, if anything, "felt somewhat advantaged because at least [he] knew the layout of the building."

Counsel said that, had he requested a mental health evaluation to determine the petitioner's state of mind at the time of the offenses, it would have required the petitioner to waive the 180-day limit which the petitioner was not willing to do.

On cross-examination, counsel agreed that any delay past the 180 days was a nonnegotiable issue with the petitioner. He said that there were "promising avenues or areas," particularly the petitioner's mental health situation, that he and the petitioner "wanted to explore [that] were terminated by the short time frame." Counsel could have gotten the petitioner evaluated for competency to stand trial and insanity at the time of the offenses within the thirty-two days, but he did not feel that either "of those two things were at issue." However, he thought it would have been "promising" to explore the petitioner's intent at the time of the commission of the crimes. Counsel noted that the petitioner "demonstrated a strong knowledge of many aspects of the law," particularly in the area of the Interstate Compact on Detainers, and he did not think the petitioner was confused about the proceedings. In counsel's opinion, the petitioner "was clearly competent, angry, but competent.

Counsel did not think that a "standard evaluation" would have been helpful but that a more in-depth evaluation, involving "some prodigious record collection" and obtaining funds to employ a private mental health professional, could have been advantageous to the defense. He would have had such professional explore the petitioner's waiver of rights. Counsel knew that the petitioner had claimed "heavy drug use" during the time period of the offenses and when he gave his statement. He spoke with the petitioner's federal habeas counsel before the petitioner's state trial about mental health defenses and learned that she intended to employ an addictionologist. After the trial, federal habeas counsel sent counsel

a copy of the addictionologist's report. Counsel agreed that the information in the report could have been helpful, and he "certainly could have considered it" had it been available before trial.

Counsel agreed that trying to negate the mens rea for the offenses would have been the best, if not only, avenue of defense. However, counsel noted that the mens rea for carjacking was intentional or knowing, and he "thought it would have been a tremendous leap to be able to show to a jury that [the petitioner]'s conduct that day was not knowing." Counsel agreed that the petitioner's statement to the police was unfavorable and that with some of this additional information he would have potentially had a good faith basis for filing a motion to suppress.

Counsel testified that he and the petitioner had a somewhat contentious relationship and that the petitioner decided "very quickly" that he did not want counsel as his lawyer and asked him to withdraw. Counsel did not recall telling the petitioner it was a waste of time and resources to represent him, and he noted that "it doesn't sound at all like me." Counsel said that he probably would have told the petitioner that the fact he confessed made it difficult to prepare an effective defense.

Counsel agreed that he would have liked to have taken additional steps to investigate the petitioner's mental health but for the petitioner's insistence on being tried within the 180-day time frame. He told the petitioner that he could "do more" if he had more time and maintained that they "definitely had a conversation about that." He said that the petitioner told him about a couple of physicians who "had critical information," but counsel could not find them after a thorough search. Counsel maintained that the fact that his wife worked in the vicinity of the petitioner's crime spree did not affect his representation.

On redirect examination, counsel testified that, at the time he represented the petitioner, he had "very few cases" and was able to "devote significant amounts of time to the case." His records reflected that over ninety-nine hours of attorney time and twenty-six hours of staff time were spent on the petitioner's case.

Smith v. State, No. M2012-02705-CCA-R3-PC, 2013 WL 5701657, at **2-6 (Tenn. Crim. App. Oct. 18, 2013).

**IV.     Claims of the Petition**

In his petition for writ of habeas corpus, Smith asserts two ineffective assistance of counsel claims:

1.   Whether the Petitioner received ineffective assistance of trial counsel with regard to counsel not securing a mental health/competency evaluation of the Petitioner prior to trial   (Doc. No. 27 at p. 9); and

2.   Whether the Petitioner received ineffective assistance of trial counsel with regard to counsel not seeking suppression of the Petitioner's statement of confession.   (Id.)

**V.     General Standards Governing Review of § 2254 Petitions**

The petition in this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). The AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences . . . and to further the principles of comity, finality, and federalism." Woodford v. Garceau, 538 U.S. 202, 206, 123 S. Ct. 1398, 155 L.Ed.2d 363 (2003) (internal citations and quotation marks omitted). As the Supreme Court explained, the AEDPA "recognizes a foundational principle of our federal system: State courts are adequate forums for the vindication of federal rights." Burt v. Titlow, 571 U.S. –––, 134 S. Ct. 10, 15, 187 L.Ed.2d 348 (2013).   The AEDPA, therefore, "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." Id.

One of the AEDPA's most significant limitations on the federal courts' authority to issue writs of habeas corpus is found in 28 U.S.C. § 2254(d).   Under the AEDPA, the court may grant a writ of habeas corpus on a claim that was adjudicated on the merits in state court if that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 405 (2000).

The state court's factual findings are presumed to be correct and they can be contravened only if the petitioner can show by clear and convincing evidence that the state court's factual findings were erroneous. 28 U.S.C. § 2254(e)(1). The petitioner is entitled to an evidentiary hearing if he alleges sufficient grounds for issuance of the writ, relevant facts are in dispute, and the state courts did not hold a full and fair evidentiary hearing. Sawyer v. Hofbauer, 299 F.3d 605, 610 (6th Cir. 2002). As the Supreme Court has advised, "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable-a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473, 127 S. Ct. 1933, 167 L.Ed.2d 836, (2007) (citing Williams, 529 U.S. at 410). The Supreme Court has held that review under § 2254(d) (1) "is limited to the record that was before the state court that adjudicated the claim on the merits." Cullen v. Pinholster, 563 U.S. 170, 131 S. Ct. 1388, 1398, 179 L.Ed.2d 557 (2011).

Further, "[b]efore seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b), thereby giving the State the 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." Baldwin v. Reese, 541 U.S. 27, 29 (2004) (citations omitted). "To provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court (including a state supreme

court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." Id. (citation omitted). Claims which are not exhausted are procedurally defaulted and "ordinarily may not be considered by a federal court on habeas review." Alley v. Bell, 307 F.3d 380, 388 (6th Cir. 2002).

"In order to gain consideration of a claim that is procedurally defaulted, a petitioner must demonstrate cause and prejudice for the failure, or that a miscarriage of justice will result from the lack of review." Alley, 307 F.3d at 386. A petitioner can establish cause in two ways. First, a petitioner may "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." Murray v. Carrier, 477 U.S. 478, 488 (1986). Objective impediments include an unavailable claim or interference by officials that made compliance impracticable. Id. Second, constitutionally ineffective assistance of trial or appellate counsel may constitute cause. Murray, 477 U.S. at 488–89. Generally, however, if a petitioner asserts ineffective assistance of counsel as cause for a default, that ineffective-assistance claim must itself have been presented to the state courts as an independent claim before it may be used to establish cause. Id. If the ineffective-assistance claim is not presented to the state courts in the manner that state law requires, that claim is itself procedurally defaulted and can only be used as cause for the underlying defaulted claim if the petitioner demonstrates cause and prejudice with respect to the ineffective-assistance claim. Edwards v. Carpenter, 529 U.S. 446, 452–53, 120 S. Ct. 1587, 146 L.Ed.2d 518 (2000).

Until recently, a prisoner could not demonstrate cause for default by claiming that she received ineffective assistance of counsel during state post-conviction proceedings. See Coleman v. Thompson, 501 U.S. 722, 752–53, 111 S. Ct. 2546, 115 L.Ed.2d 640 (1992) (holding that

attorney error is not cause to excuse a default). The holding in <u>Coleman</u> was based on the premise that an individual does not have a constitutional right to counsel in post-conviction proceedings, so the prisoner "must bear the risk of attorney error that results in a procedural default." <u>Id.</u> (internal quotations omitted).

Recent changes in the law, however, have enabled petitioners in Tennessee to establish "cause" to excuse the procedural default of a substantial claim of ineffective assistance by demonstrating the ineffective assistance of post-conviction counsel in failing to raise the claim in initial-review post-conviction proceedings. <u>See Martinez v. Ryan</u>, 566 U.S. ---, 132 S. Ct. 1309, 1315, 1320, 182 L.Ed.2d 272 (2012) (creating an exception to <u>Coleman</u> where state law prohibits ineffective-assistance claims on direct appeal); <u>Trevino v. Thaler</u>, 569 U.S. ---, 133 S.Ct. 1911, 1921, 185 L.Ed.2d 1044 (2013) (extending <u>Martinez</u> to states with procedural frameworks that make meaningful opportunity to raise ineffective-assistance claim on direct appeal unlikely); <u>Sutton v. Carpenter</u>, 745 F.3d 787, 792 (6th Cir. 2014) (holding that <u>Martinez</u> and <u>Trevino</u> apply in Tennessee).

The Supreme Court's creation in <u>Martinez</u> of a narrow exception to the procedural-default bar stemmed from its recognition, "as an equitable matter, that the initial-review collateral proceeding, if undertaken without counsel or with ineffective counsel, may not have been sufficient to ensure that proper consideration was given to a substantial claim." <u>Martinez</u>, 132 S. Ct. at 1318. In other words, <u>Martinez</u> requires that the ineffective assistance of post-conviction counsel occur during the "initial-review collateral proceeding," and that "the underlying ineffective-assistance-of-trial-counsel claim [be] a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." <u>See id.</u> at 1318–19, 1320. Importantly, <u>Martinez</u>

did not dispense with the "actual prejudice" prong of the standard for overcoming procedural default first articulated by the Supreme Court in Coleman, 501 U.S. at 750.

To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his actual and substantial disadvantage." Perkins v. LeCureux, 58 F.3d 214, 219 (6th Cir. 1995) (quoting United States v. Frady, 456 U.S. 152, 170, 102 S. Ct. 1584, 71 L.Ed.2d 816 (1982) (emphasis in original)). "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." Simpson v. Jones, 238 F.3d 399, 409 (6th Cir. 2000) (citations omitted).

Because the cause-and-prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the Supreme Court has also recognized a narrow exception to the cause requirement where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense. Dretke v. Haley, 541 U.S. 386, 392, 124 S. Ct. 1847, 158 L.Ed.2d 659 (2004) (citing Murray, 477 U.S. at 496).

VI.     Analysis

With these principles in mind, the Court will turn to the examination of the claims raised in Smith's petition for habeas relief.    Smith claims that he received ineffective assistance from his trial counsel.[2]   (Doc. No. 27).

The Sixth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, guarantees the right of a person accused of a crime to the effective assistance of counsel.    To prevail on a claim of ineffective assistance of counsel, a petitioner

---

[2]Attorney Joseph Michael Engel of the Davidson County Public Defenders' Office represented the petitioner at trial.

must show (1) deficient performance of counsel and (2) prejudice to the defendant. <u>See Bell v. Cone</u>, 535 U.S. 685, 694-95 (2002). Trial counsel's performance is deficient when it falls below an objective standard of reasonableness. <u>See Strickland v. Washington</u>, 466 U.S. 668, 686-87 (1984); <u>Combs v. Coyle</u>, 205 F.3d 269, 278 (6th Cir. 2000), <u>cert. denied</u>, 531 U.S. 1035 (2000). In assessing performance, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." <u>Strickland</u>, 466 U.S. at 690-91. Reasonable attorneys may disagree on the appropriate strategy for defending a client. <u>Bigelow v. Williams</u>, 367 F.3d 562, 570 (6th Cir. 2004).

The prejudice element requires a petitioner to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Strickland</u>, 466 U.S. at 694.

A court hearing an ineffective assistance of counsel claim must consider the totality of the evidence. <u>Strickland</u>, 466 U.S. at 695. "The determinative issue is not whether petitioner's counsel was ineffective but whether he was so thoroughly ineffective that defeat was 'snatched from the jaws of victory.'" <u>West v. Seabold</u>, 73 F.3d 81, 84 (6th Cir. 1996)(quoting <u>United States v. Morrow</u>, 977 F.2d 222, 229 (6th Cir. 1992)(<u>en banc</u>)). "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or

omission of counsel was unreasonable."   Strickland, 466 U.S. at 689.

> 1. Ineffective assistance of trial counsel for failing to obtain a mental/competency evaluation of the Petitioner prior to trial

> a. Exhaustion

The Petitioner raised this claim in state court on post-conviction review and appealed the denial of this claim to the Tennessee Court of Criminal Appeal. The Petitioner therefore has exhausted this claim.

> b. Merits

The Petitioner alleges that trial counsel provided ineffective assistance of counsel by failing to obtain a mental health evaluation and/or a competency evaluation prior to trial. (Doc. No. 27 at p. 10). The Petitioner asserts that trial counsel had several bases for arguing that the Petitioner lacked the capacity to form the mens rea element of the charged offenses, any of which could have been proven by obtaining a mental health evaluation and/or competency evaluation prior to the Petitioner's trial. The Petitioner asserts that he suffered from mental illness; he had been drinking alcohol, smoking crack, and injecting cocaine, heroin and dilaudid intravenously over the two weeks leading up to his crime spree and was under the influence of both alcohol and drugs at the time of the charged conduct; and he had slept little over the course of the two weeks prior to the crime spree, and his sleep deprivation worsened his mental health problems and rendered him less capable of forming the culpable mental state required for conviction. According to Petitioner, had trial counsel introduced this evidence, there is a reasonable probability that he would not have been convicted of one or more of the offenses for which he is now serving a lengthy sentence of imprisonment. (Id. at pp. 10-11).

In reviewing the Petitioner's claim that trial counsel was ineffective by failing to obtain a

competency or mental health evaluation, the post-conviction court held:

> The first issue that the Petitioner raises is that trial counsel failed to have the Petitioner evaluated for competency or to assess the viability of a mental health related defense at trial. The Court finds that Mr. Engle considered having the Petitioner evaluated prior to trial. The Court finds that such an evaluation would have delayed the trial. The Court finds that the Petitioner insisted to Mr. Engle on proceeding to trial without delay. The Court finds that, in proceeding to trial without a mental health evaluation, Mr. Engle was following the Petitioner's adamant and explicit instructions. The Court is therefore of the opinion that this allegation is without merit.

(Doc. No. 34, Attach. 8, PageID# 1227).

In reviewing the post-conviction court's denial of the petitioner's claim, the Tennessee Court of Criminal Appeals applied the governing legal standard for claims of ineffective assistance of counsel:

> To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L.Ed.2d 674 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App.1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

>> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

> 466 U.S. at 687.

> The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an

objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn.1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn.1975)). Moreover, the reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn.1982). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

Smith, 2013 WL 5701657, at *7. The Tennessee Court of Criminal Appeals then applied the

governing law to the facts of Smith's case and concluded:

The petitioner argues that counsel was ineffective for failing to have a mental health professional evaluate him "for competency to stand trial and/or other mental health analysis that could help in [his] defense." He asserts that there were "red flags" in his behavior and history that should have put counsel on notice that a further investigation into his mental health was warranted.

At the evidentiary hearing, counsel testified that, had he requested a mental health evaluation to determine the petitioner's state of mind at the time of the offenses, it would have required the petitioner to waive the 180-day limit which the petitioner was not willing to do. Counsel could have gotten the petitioner evaluated for competency to stand trial and insanity at the time of the offenses within the time period remaining, but he did not feel that either "of those two things were at issue." Counsel noted that the petitioner "demonstrated a strong knowledge of many aspects of the law," particularly in the area of the Interstate Compact on Detainers, and he did not think the petitioner was confused about the proceedings. In counsel's opinion,

the petitioner "was clearly competent, angry, but competent."

Counsel did not think that a "standard evaluation" would have been helpful but that a more in-depth evaluation, involving "some prodigious record collection" and obtaining funds to employ a private mental health professional, could have been advantageous to the defense. However, any area counsel thought worth exploring was foreclosed by the petitioner's insistence on not delaying the trial past the 180 days, which was a non-negotiable issue with the petitioner.

The petitioner testified that he did not recall counsel's ever saying that there were other things he could do if he had more time, and he denied telling counsel that he wanted to have a trial rather than ask for more time to prepare. He acknowledged that a mental evaluation would have taken time and required that he agree to being tried outside of the 180-day period, and he could not remember whether he was willing to waive the 180-day period.

In ruling on this issue, the post-conviction court accredited counsel's testimony in finding that, "in proceeding to trial without a mental health evaluation, [counsel] was following the [p]etitioner's adamant and explicit instructions." The petitioner has not shown that counsel performed deficiently, and the record supports the postconviction court's determination.

Id. **7-8.

Having reviewed the entire record in this case, the Court finds that the state courts correctly applied federal law and reasonably determined the facts in    concluding that trial counsel did not render ineffective assistance when, under the circumstances of this case, he did not obtain a mental health or competency evaluation of the Petitioner prior to trial.

During the Petitioner's post-conviction hearing, trial counsel testified that, if he had obtained some type of mental health evaluation to determine the Petitioner's state of mind at the time the offenses occurred, it would have taken the Petitioner out of the 180-day deadline for completing his state trial, and the Petitioner was unwilling to waive the 180 days.  (Doc. No. 27-

4, PageID#436).   Trial counsel conceded that he could have gotten the Petitioner evaluated as to competency to stand trial and insanity at the time of the commission of the offense, but trial counsel did not find those two matters to be pertinent.   (Id. #439)   Instead, trial counsel testified that, "[w]hat would have been at issue and what was promising to me was an exploration of his mental intent at the time of the commission of the crime, the mens rea."   (Id. #439).   Elaborating, trial counsel testified that, "[i]n an ideal case I would have gathered records, gone through some prodigious record collection in this case and then approached the Court under Rule 13(5) and asked for funds to employ a private mental health professional to investigate this with me."   (Id. #440). Trial counsel conceded that the best avenue of trying to defend his client would have been negating "some of the mens rea for some of the[] offenses," and that "[i]t would appear maybe even to have been the only avenue" since there "was no question" as to the perpetrator's identity.   (Id. #443). However, in his experience as a seasoned criminal defense attorney, trial counsel did not believe he had time to accomplish what he needed to do within the time remaining before the Petitioner's trial, given that the Petitioner would not agree to a continuance.   Nevertheless, trial counsel testified that, "[e]ven despite a potential intoxication," he thought "it would have been a tremendous leap to be able to show to a jury that Mr. Smith's conduct that day was not knowing."   (Id.)

Trial counsel further testified at the post conviction hearing:   "I do recall saying to him [the Petitioner] that if we had more time I could do more.   Now, in exploring mental health issues Mr. Smith kept referring me to a couple of physicians who he said had critical information.   I could not find them and I made a thorough search for them and actually I believe, according to some correspondence that I was copied on, Mr. Smith continued to look for them after the trial . . . ."   (Id. #446-47).   Trial counsel logged 99 hours and 28 minutes of attorney time and 26 hours

of staff time on Smith's defense between the date of appointment and May 21, 2009. (Id. #450).

The Petitioner testified at his post-conviction hearing that he recalled having conversations with trial counsel about the trial date but the Petitioner did not recall counsel ever telling him that there were other things trial counsel could do if he had more time. Smith, 2013 WL 5701657, at *3. The Petitioner denied telling counsel that he wanted to proceed with the trial rather than ask for more time to prepare. Id. The post-conviction court accredited trial counsel's testimony over that of the Petitioner, and the record does not preponderate against the state courts' findings that counsel followed the Petitioner's adamant and explicit instructions.

The Petitioner points out that after his trial Mr. Engle was able to obtain two evaluations of the Petitioner – one from a mental health expert retained by trial counsel in preparation for Smith's sentencing and the other from an addiction specialist retained by Smith's counsel in the separate federal appeal of his bank robbery convictions. Dr. James S. Walker conducted his evaluation of Smith on May 5, 2009, and was able to provide a written report to counsel within a matter of days. In fact, Dr. Walker's expert report was introduced into evidence at the sentencing hearing on May 14, 2009, just nine days after Walker met with Smith to conduct the evaluation. (Doc. No. 27-5, PageID#459). Similarly, Dr. Murray W. Smith interviewed the Petitioner on April 14, 2009, and completed his written report just nine days later on April 23, 2009. (Docket 27-7, PageID#504). According to the Petitioner, these very short time lines demonstrate that trial counsel could have initiated both a psychological and addiction evaluation soon after getting Smith's case and obtained a written expert report before the trial date.

This argument is enticing on its face. However, the Court cannot evaluate trial counsel's effectiveness using hindsight. "[J]udicial scrutiny of a counsel's performance must be highly

deferential and [] every effort must be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Bell v. Cone, 535 U.S. 686, 698 (2002)(citation, quotation and editorial marks omitted). The Court must consider the reasonableness of Mr. Engle's choices at the time – facing the thirty-two days he had available to him before the Petitioner's trial began.

Mr. Engle, an experienced criminal defense lawyer, believed that he could not seek and obtain funding from the Court, schedule the Petitioner's evaluations, await the written reports from those evaluations, review those reports, and prepare a trial strategy based on those reports within the thirty-two days remaining before the Petitioner's trial. Having so determined but believing that such a strategy showed promise, trial counsel sought permission from his client to ask for a continuance for the express purpose of developing a defense strategy based on the Petitioner's mental health or competency. According to trial counsel, the Petitioner adamantly opposed a continuance. Trial counsel also sought permission from the Petitioner to access the Petitioner's federal public defender's records in an effort to glean information that might be useful to the Petitioner's state defense. Again, the Petitioner denied his attorney a potentially-beneficial avenue of defense by refusing to sign the release. Despite these setbacks, during the thirty-two days, trial counsel performed a thorough search for two physicians who the Petitioner claimed had critical information about the Petitioner's mental health; the physicians could not be located. Trial counsel logged 99 hours and 28 minutes of attorney time and 26 hours of staff time on Smith's defense. Ultimately, trial counsel acknowledged at the post-conviction hearing that, even if he had been able to produce evidence in time for trial showing the Petitioner's mental state at the time of the offenses, trial counsel felt that "it would have been a tremendous leap to be able to show to

a jury that Mr. Smith's conduct that day was not knowing."    The Court finds that the state courts' decision that counsel was not deficient under these circumstances does not contravene clearly established law, nor is it an unreasonable determination of the facts in light of the evidence presented.

Even if trial counsel had rendered deficient performance by failing to secure a mental health evaluation prior to trial, the Petitioner has failed to demonstrate that he was prejudiced by the deficiency.    That is to say, the Petitioner has not established a reasonable probability that the trial would have ended with a different result had such evidence been introduced at trial, given the overwhelming evidence of the Petitioner's guilt.    The State's case against the Petitioner was strong, as the Court outlines below in more detail.    The Court therefore concludes that the Petitioner is not entitled to relief on the basis of this claim.

> 2.    Ineffective assistance of trial counsel for failing to move to suppress the Petitioner's statement to police

Immediately after the Petitioner's arrest, police took him to General Hospital, where he was read his <u>Miranda</u> rights.    He then signed a rights waiver form and gave a statement in which he admitted to one of the bank robberies, both carjackings, and other attempts to take a vehicle. (Docket No. 27, Exh. 3, Trial Tr. Vol. II at p. 183; Exh. 1, Trial Exhibits at 16-B).    In the second claim of his federal habeas petition, the Petitioner asserts that trial counsel provided ineffective assistance of counsel in failing to seek the suppression of the Petitioner's incriminating statement to police.    (Docket No. 27 at p. 14).

> a.    Exhaustion

The Petitioner raised this claim in state court on post-conviction review and appealed the

denial of this claim to the Tennessee Court of Criminal Appeals. The Petitioner therefore has exhausted this claim.

> b. Merits

In its order denying the post-conviction petition, the trial court rejected this claim as follows:

> The second issue that the Petitioner raises is that trial counsel failed to pursue a motion to suppress the Petitioner's statement to police in light of his serious drug use around the time of the offenses and his mental health issues. The Court finds that Mr. Engle explored the viability of a motion to suppress the Petitioner's confession and determined that, under the circumstances, such a motion was not warranted. The Court finds that this determination by Mr. Engle was entirely reasonable. However, the Court finds that even if Mr. Engle's failure to file a motion to suppress the Petitioner's confession constitutes ineffective assistance of counsel, the Petitioner still cannot prevail on this claim. The Court finds that, in addition to the Petitioner's confession, there was a substantial amount of evidence against him, and the Petitioner conceded this at the hearing. The Court finds that the Petitioner failed to demonstrate that, but for the alleged error on the part of Mr. Engle, "there is a reasonable probability that . . . the result of the proceeding would have been different." Strickland, 466 U.S. at 694. The Court is therefore of the opinion that the Petitioner has failed to carry his burden and that this allegation is without merit.

(Doc. No. 34, Attach. 8, PageID# 1228).

The petitioner raised this claim on appeal from the denial of post-conviction relief. After noting the Strickland standard for resolving claims of ineffective assistance of counsel, the Tennessee Court of Criminal Appeals held as follows:

> The petitioner argues that counsel was ineffective for failing to file a motion to suppress his statement in light of his "serious drug use around the time of the offenses and his potential mental health issues."

> Counsel testified that the petitioner wanted him to file a motion to

suppress the statement due to "his profound intoxication by use of drugs and his distraught emotional state." However, the petitioner told counsel that he was the only possible witness to those matters. Counsel also reviewed the petitioner's statement and thought that the petitioner responded coherently to the detective's questions and "d[id]n't sound crazy." Counsel did not think the statement had a "[]gross indicia of invalidity" and said they "would have need[ed] to have had a lot more information about [the petitioner]'s mental health" to have an effective motion to suppress. The petitioner's federal trial and habeas counsel offered to provide counsel with the petitioner's federal presentence report, which counsel thought might contain "critical" information about the petitioner's social and treatment history, but the petitioner would not sign a release for counsel to obtain the document. Counsel stated that it was a tactical decision to not file a motion to suppress "in the sense that [he] didn't feel that [they] had enough information to prevail on it[.]"

In ruling on this issue, the post-conviction court found that counsel's determination to not file a motion to suppress "was entirely reasonable." Moreover, the postconviction court noted that there was "a substantial amount of evidence" against the petitioner, supporting the court's conclusion that the petitioner did not demonstrate that there is a reasonable probability that the result of the proceeding would have been different had the statement been suppressed.

Smith, 2013 WL 5701657, at *8.

This claim presents a closer question. At the post-conviction hearing, trial counsel testified that the Petitioner asked him to file a motion to suppress based on "his profound intoxication by use of drugs and his distraught emotional state." (Doc. No. 27-4, PageID #434). Trial counsel testified that he was bothered that, other than the Petitioner, there was no one to support the Petitioner's claim that he was intoxicated. (Id. #434). Trial counsel also stated that, upon his review of the Petitioner's statement, it was "coherent" and didn't "sound crazy." (Id. #434). Elaborating, trial counsel continued: "Mr. Smith [wa]s able to respond to the detective's questions and make answers, so it didn't have in and of itself engross indicia of invalidity, to

effectively move to suppress that motion I would think that we would need to have had a lot more information about Mr. Smith's mental health than what we had."  (Id. #434-35).

However, what the record now shows is that trial counsel ultimately was able to obtain the opinion of addiction specialist Dr. Murray W. Smith who opined, after evaluating Smith, that his "judgment was severely impaired during the time of 23 June, 2007 through 25, June 2007" and Smith, as a result, "made multiple irrational decisions, including the Waiver of his <u>Miranda</u> rights during that time" (Doc. No. 27, Ex. 7) as well as the opinion of Dr. James S. Walker, who concluded, after evaluating Smith, that he "used his last hit of cocaine approximately one hour prior to his arrest and giving his statement to police" and was substantially impaired by his drug/alcohol intoxication, possible bipolar disorder, and maladaptive personality characteristics at the time of his offenses and statement (<u>Id.</u>, Ex. 5).    Although the Court cannot evaluate counsel's performance using the benefit of hindsight, the Court may consider whether trial counsel's failure to file a motion to suppress Smith's post-arrest statement without further investigation <u>at that time</u> fell below professional norms.

Assuming without deciding that trial counsel performed deficiently by failing to investigate and uncover evidence of Smith's heavy drug use in the weeks leading up to his offenses and statement, his two arrests for flagrant drug use during this period, his sleep deprivation, his poor mental health, and expert opinions as to his inability to comprehend a <u>Miranda</u> waiver, the Court also must nevertheless consider whether the Petitioner has demonstrated that he was prejudiced by trial counsel's errors.   <u>Williams v. Taylor</u>, 529 U.S. 362, 391 (2000)(the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.   A reasonable probability is a probability sufficient to

undermine confidence in the outcome.").    In other words, if trial counsel had filed a motion to suppress the Petitioner's statement and had prevailed, would the outcome of this case have been different?[3]

The answer is no.   There was overwhelming evidence of guilt beyond the Petitioner's confession.   The victim's' testimony about their interactions with the Petitioner undermine any assertion that the Petitioner lacked the requisite mens rea in committing the offenses.   The two armed robberies committed by the Defendant established a motive for all but one of the crimes of which the Defendant was convicted.   The Defendant carjacked Ms. Runder in order to obtain a vehicle to use in the bank robberies.   Immediately following the bank robberies, the Defendant carjacked Ms. Barnett, attempted to carjack Mr. Greene, accosted three other individuals and attempted to take their vehicles, and assaulted Mr. Hedger.   All was done in the Defendant's attempt to avoid arrest for the two armed bank robberies he had just committed.

Ms. Sung, the victim of the Adcock Shell station in Madison, Tennessee, identified the Defendant as the robber who, armed with scissors, took money from the cash register of her store. She testified that she knew the Defendant because he had been a regular customer at the gas station for approximately one year.   In addition to Ms. Sung's testimony, the State introduced surveillance video taken from the gas station showing the Defendant committing the robbery.

---

[3]In the Petitioner's Amended Complaint, the Petitioner focuses on whether there is a reasonable possibility that Smith would have prevailed on a motion to suppress had trial counsel filed such motion and then supported it at an evidentiary hearing.   (Docket No. 27 at p. 16).   However, even if the Court were to find it likely that the Petitioner would have prevailed on a motion to suppress his post-arrest statement, for purposes of evaluating the Petitioner's ineffective of assistance habeas claim, the Court must consider whether the Petitioner has demonstrated prejudice as to the outcome of the trial – whether the absence of the Petitioner's statement of confession would have changed the outcome of the trial.   As the Court explains above, the state courts were reasonable in concluding that the absence of the Petitioner's confession would not have changed the outcome, given the overwhelming witness testimony as to the Petitioner's identity, conduct, and statements.

Ms. Runder picked the Defendant's picture out of a photographic line-up and was able to identify the Defendant at trial as the person who hijacked her at the Shell gas station near Vanderbilt University. Ms. Barnett picked the Defendant's picture out of a photographic line-up and identified him at trial as the person who stole her minivan. Mr. Greene identified the Defendant as the man who attempted to carjack him. Uere Hobson, a driver for Federal Express, identified the Defendant at trial as the man who attempted to take her truck. Justin Lear identified the Defendant as the man who tried to take his vehicle. Lear's wife, who was also present, identified the Defendant. Bianca Tarantola identified the Defendant as the man who attempted to take her car. Tarantola's uncle, Dan Hedger, identified the Defendant as the man who struck him in the face as he attempted to intervene.

Officer Ronnie Brock of the Nashville Metropolitan Police Department testified that he that was summoned and, at the direction of witnesses, arrested the Defendant as he was walking away carrying a bag containing a large amount of cash.

None of these witnesses testified that the Petitioner seemed confused about what he was doing. In fact, Ms. Barnett testified that the Petitioner shouted "no, no, no" when he looked at Ms. Barnett's minivan and saw that it was nearly identical to the one he had taken from Ms. Runder. This evidence further supports a finding of intentional and knowing behavior by the Petitioner, regardless of whether his confession was admitted into evidence.

Given all of the evidence, the Court cannot conclude that the absence of the Petitioner's confession would have changed the outcome of his trial. Thus, even if trial counsel erred in failing to pursue a motion to suppress the confession, the Court's confidence in the outcome of the trial has not been undermined by such error.

Because the Petitioner has failed to demonstrate that the state courts' adjudication of this claim involved an unreasonable application of clearly established federal law or was based upon an unreasonable determination of the facts in light of the evidence before the state court, he is not entitled to habeas relief on this claim.

## VII.    Conclusion

For the reasons set forth herein, Broderick Smith's petition under § 2254 will be denied as to all claims, and this action will be dismissed with prejudice.

Federal Rule of Appellate Procedure 22 provides that an appeal of the denial of a habeas petition may not proceed unless a certificate of appealability (COA) is issued under 28 U.S.C. § 2253. Rule 11 of the Rules Governing § 2254 Cases requires that a district court issue or deny a COA when it enters a final order. A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller–El v. Cockrell, 537 U.S. 322, 327 (2003). The district court must either issue a COA indicating which issues satisfy the required showing or provide reasons why such a certificate should not issue. 28 U.S.C. § 2253(c)(3); Fed. R. App. P. 22(b).

Because jurists of reason could possibly disagree with the resolution of these claims, the Court will grant the Petitioner a COA, should the Petitioner file an appeal.

An appropriate order will be entered.

_____
WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE